IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                    Respondent/Plaintiff,

      Vs.                            Nos.  02-40153-01-SAC
                                            11-4058-SAC

KEVIN X. FRATER,

                    Movant/Defendant.

MEMORANDUM AND ORDER

        With information supplied by drug task force agents in Burbank, California, agents in Kansas with the Drug Enforcement Agency ("DEA") conducted an interdiction of a medium-sized business jet flying from California to New York that had made a refueling stop in Salina, Kansas, on December 10, 2002.  Agents found one passenger, Austin Williams, with five large suitcases that contained 155 packages of cocaine each weighing approximately one kilogram.  Williams worked for Kevin Frater as a first officer and a customer services agent escorting luggage on a number of flights between New York and California.  Upon his arrest, Williams cooperated with agents in making a series of controlled phone calls to Frater telling him the plane was having mechanical problems and attempting to lure Frater to Salina.  The next day, Frater booked a flight to Salina arranging for Damian Coverley and Charles Bowe to accompany him, but

Frater later "cancelled the flight telling Coverley and Bowe that something was wrong and that it wasn't worth it." (Presentence Report, ¶ 26).

On December 11, 2002, the grand jury returned a sealed indictment charging Kevin Frater and Austin Williams with conspiracy to distribute cocaine, and an arrest warrant was issued for Frater on December 13, 2002. In January of 2003, a sealed superseding indictment was returned charging Frater and Williams with conspiracy to distribute at least 153.4 kilograms of cocaine and Williams with a second count of possession with intent to distribute 153.4 kilograms of cocaine. The arrest warrant for Frater issued on January 29, 2003. In April of 2009, Frater was detained in Heathrow Airport during a return trip from Jamaica to Dubai, arrested and taken into custody in London, England, then extradited to the United States, and arraigned in this court on September 1, 2009. (Dk. 103).

On March 23, 2010, Frater entered a guilty plea to count one of the superseding indictment pursuant to Fed. R. Crim. P. 11(c)(1)(C) with an agreed 120-month sentence. (Dks. 174 and 175 at p. 12). The court sentenced the defendant Frater to 120 months of incarceration on June 16, 2010, and Frater did not file a direct appeal but did file a timely motion to vacate under 28 U.S.C. § 2255 on June 13, 2011. (Dk. 185).

**ISSUES FOR § 2255 RELIEF**

Frater articulates four grounds for relief: (1) denial of due

process for delaying execution of arrest warrant from January 29, 2003, through April 7, 2009; (2) violation of his constitutional right to a speedy trial; and (3) ineffective assistance of counsel in not investigating the evidence, in not challenging constitutional violations as requested by the defendant, and in not explaining the meaning and consequences of plea agreement.

**GENERAL § 2255 STANDARDS**

A district court may grant relief under § 2255 if it determines "that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255. "Review under § 2255 is not an alternative to appellate review for claims that could have been presented on direct appeal but were not." *United States v. Magleby*, 420 F.3d 1136, 1139 (10th Cir. 2005), *cert. denied*, 547 U.S. 1097 (2006). A movant may overcome this procedural bar by showing either of "two well recognized exceptions." *United States v. Cervini*, 379 F.3d 987, 990 (10th Cir. 2004), *cert. denied*, 544 U.S. 904 (2005). First, the movant must show good cause for not raising the issue earlier and actual prejudice to the movant's defense if the issue is not considered. *Id.* Cause may "be established by showing that counsel

rendered constitutionally ineffective assistance." *United States v. Wiseman*, 297 F.3d 975, 979 (10th Cir. 2002) (citations omitted). Second, the "'failure to consider the federal claims will result in a fundamental miscarriage of justice.'" *Cervini*, 379 F.3d at 990 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

The court is to hold an evidentiary hearing "unless the [§ 2255] motion and files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; *United States v. Galloway*, 56 F.3d 1239, 1240 n. 1 (10th Cir. 1995). The defendant has the burden to allege facts that would entitle him or her to relief upon proof. *See Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995), *cert. denied*, 517 U.S. 1235 (1996), *partial overruling on other grounds*, *Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001). "[T]he allegations must be specific and particularized, not general or conclusory." *Id.* The court may forego an evidentiary hearing if the movant's factual allegations are "contradicted by the record, inherently incredible, or when they are conclusions rather than statements of fact." *United States v. Caraway*, 2010 WL 3721689 at *2 (D. Kan. Sept. 15, 2010) (citing *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)), *cert. of appealability denied*, 417 Fed. Appx. 828 (10th Cir.), *cert. denied*, 132 S. Ct. 565 (2011); *see also United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) ("rejecting

ineffective assistance of counsel claims which are merely conclusory in nature and without supporting factual averments")).  Simply put, without a colorable showing of entitlement to relief, the district court does not abuse its discretion in denying an evidentiary hearing.  *See Hooks v. Workman*, 606 F.3d 715, 731 (10th Cir. 2010).  A hearing is unnecessary here, for the record in this case fully confirms the reasons and grounds establishing that the defendant is not entitled to relief on his claims.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. Amend. VI; *Kansas v. Ventris*, 556 U.S. 586, 129 S.Ct. 1841, 1844 (2009).  To prevail on a claim of ineffective assistance of counsel, the defendant must prove two prongs:  first, "that his 'counsel's representation fell below an objective standard of reasonableness,' *Strickland v. Washington*, 466 U.S. 668, 688 (1984)," and second, "'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' *id*. at 694." *United States v. Taylor*, 454 F.3d 1075, 1079 (10th Cir. 2005).  "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland v. Washington*, 466 U.S. at 697.

On the first prong of objective reasonableness, a court may not

find a constitutional deficiency unless defense counsel's performance is "completely unreasonable, not merely wrong." *Boyd v. Ward*, 179 F.3d 904, 914 (10th Cir. 1999), *cert. denied*, 528 U.S. 1167 (2000). Proof must show the counsel's conduct was not "within the wide range of competence demanded of attorneys in criminal cases." *United States v. Blackwell*, 127 F.3d 947, 955 (10th Cir. 1997) (quotation and citations omitted). A court is highly deferential in its review of the attorney's performance. *Strickland*, 466 U.S. at 689. The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689; *see United States v. Holder*, 410 F.3d 651, 654 (10th Cir. 2005). "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 281 (1986).

The movant's burden here on the second prong of prejudice is to show that but for counsel's constitutionally ineffective performance there was "a reasonable probability the jury would have had reasonable doubt regarding guilt." *Boyd v. Ward*, 179 F.3d at 914 (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Strickland*, 466 U.S. at 694. Prejudice is assessed from reviewing "the totality of the evidence, not just the evidence helpful to" the movant. *Boyd v. Ward*, 179 F.3d at 914 (citing *Cooks v. Ward*, 165 F.3d 1283, 1293 (10th Cir. 1998), *cert. denied*, 528 U.S. 834 (1999)). In order to show prejudice, the defendant must establish a reasonable probability that the result or outcome of the proceeding would have been different had his counsel filed the motion to dismiss for a violation of his speedy trial rights. *See United States v. Rushin*, 642 F.3d 1299, 1309–10 (10th Cir.2011).

"Before deciding whether to plead guilty, a defendant is entitled to the effective assistance of competent counsel." *Padilla v. Ky.*, ––– U.S. ––––, 130 S.Ct. 1473, 1480–81 (2010) (quotation omitted). Effective performance in this context requires "counsel's informed opinion as to what pleas should be entered." *United States v. Carter*, 130 F.3d 1432, 1442 (10th Cir. 1997), *cert. denied*, 523 U.S. 1144 (1998). "In the context of a guilty plea, the prejudice prong requires a defendant to show that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *United States v. Harms*, 371 F.3d 1208, 1211 (10th Cir. 2004) (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

## STATEMENT OF FACTS

At Frater's change of plea hearing, the government presented

the following statement as the facts that could be shown in the case, and

while under oath Frater told the court it was his understanding these facts

were true:

On December 10, 2002, agents with the Burbank Drug Task Force received information that a large amount of cash had been flown from Farmingdale, New York, into the Van Nuys airport aboard a private business jet. The agents were told that the money had been transported on an aircraft bearing tail number November 179 Tango, a Gulfstream II.

In response to this information, the agents drove to the Van Nuys airport and located this aircraft. They began surveillance, and at the same time they interviewed employees of the FBO where the aircraft was parked. They learned that Austin Williams was one of three passengers who had disembarked from the flight and that Williams had rented a car for the group. The agents asked the FBO employees to notify them when Williams returned.

While the agents maintained surveillance of this aircraft, they saw another business jet pull to the front of the FBO. This jet was November 69 Sierra Whiskey, a Falcon 20 jet, and its activities struck the agents as somewhat suspicious. The agents saw this airplane taxi to the front of the FBO, where a light-skinned black male quickly loaded at least three roller suitcases into the aircraft, then the aircraft immediately taxied away and departed. Moments later the agents received a call from the FBO informing them that Williams had boarded November 69 Sierra Whiskey and left, leaving his rental car parked on the tarmac in front of the FBO.

In response to this information, the agents obtained the flight plan for this aircraft, and they learned that it was bound for Farmingdale, New York, the origination airport of the money flight on November 179 Tango, with a fuel stop in Salina, Kansas.

While the Burbank agents maintained surveillance of the prior aircraft at Van Nuys, they contacted the DEA in Kansas. The Burbank agents advised the Wichita agents of their observations, and they suggested that the Wichita agents conduct an interdiction of November 69 Sierra Whiskey at the Salina airport. The Wichita agents did, in fact, conduct the interdiction suggested by the Burbank agents.

When the agents arrived at the Salina airport, they were informed that the aircraft was on final approach. The aircraft arrived at the FBO moments later, and the agents, along with officers from the

Salina Police Department's narcotics unit, contacted the pilots. The agents sought and received permission to board the aircraft.

Once on board the aircraft, the agents found that Williams was the sole passenger. Located in the baggage compartment of the aircraft were one small suitcase, which was later determined to belong to Williams, and one bag belonging to each of the two pilots. In the cabin of the aircraft agents found one small personal bag and five large suitcases, all of which belonged to Williams. The agents asked Williams for permission to search the luggage on the aircraft, and Williams consented.

Agents opened each of the bags and the five large suitcases from the cabin; and in the small suitcase from the baggage compartment, agents found packages containing a white powdery substance which later field tested positive for cocaine. A total of 155 packages were recovered from the six bags. Each of these packages was approximately one kilogram in weight. A DEA lab report subsequently confirmed that the packages were, in fact, cocaine, and that the net weight was 153.4 kilograms.

Williams had been employed by the defendant and had worked both as a first officer on flights for the defendant, as well as performing customer service operations, to include escorting luggage on flights for the defendant. Williams had also been involved in a number of flights between New York and California for the defendant.

Williams agreed to make a series of controlled phone calls to the defendant, and during these phone calls, the defendant made incriminating statements, to include ordering Williams to check into a hotel under an assumed name with the luggage.

After Williams arrest, the DEA attempted to lure the defendant to Salina, Kansas to pick up the cocaine under a controlled scenario. It was discovered that the defendant had indeed chartered an airplane to pick Williams up from Salina. The controlled delivery of the cocaine back to the defendant, however, never materialized, even though the defendant had scheduled the flight.

Evidence further demonstrates that the defendant met with an individual by the name of Damian Coverley about the incident in Salina involving Williams. Coverley and another individual by the name of Charles Bowe met the defendant at an airport and the defendant proceeded to describe the situation involving Williams and that Williams had left the suitcases at a hotel. Coverley stated that the defendant had, in fact, called the hotel, as suspected, and inquired about the room and the luggage.

Coverley, the defendant and Bowe openly discussed the cocaine

and then made arrangements - the defendant made arrangements for the three to fly to Salina to pick up the suitcases that contained the cocaine. The next day, Coverley, Bowe and the defendant met and, however, the defendant cancelled the flight, telling Coverley and Bowe that something was wrong and that it wasn't worth it.

In short, the defendant, Kevin Frater, conspired with persons whose identities are known, both Coverley and Bowe, and with others unknown to distribute approximately 153.4 kilograms of cocaine, and that the flight into Salina constituted an overt act within the District of Kansas, subjecting the defendant to prosecution in this jurisdiction.

(Dk. 177, pp. 16-22).

## CONSTITUTIONAL SPEEDY TRIAL CLAIM

The defendant argues that his constitutional rights to due process[1] and to a speedy trial were violated by the government's delay of six years and two months between the indictment and his arrest and that his trial counsel was ineffective by failing to present a motion to dismiss. He contends the relevant factors weighed and balanced will sustain his constitutional claim and establish his trial counsel was ineffective in not raising it. From the evidence of record, the government counters that the critical factors weigh heavily against the defendant and that trial counsel's

---

[1]Frater does not separately analyze his due process claim, and his counsel in the reply brief devote their arguments to the Sixth Amendment right to a speedy trial. There are no facts here to suggest a separate due process claim for pre-indictment delay. Nor does Frater assert or attempt to prove here that "the prosecution intentionally delayed prosecution in order to gain a tactical advantage." *United States v. Abdush-Shakur*, 465 F.3d 458, 465 (10th Cir. 2006) (citation omitted). Alternatively, the Tenth Circuit also has adopted the *Barker* analysis as "an appropriate framework to evaluate" a due process claim based on delay. *United States v. Yehling*, 456 F.3d 1236, 1243 (10th Cir. 2006).

failure to present this issue was not ineffective.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." Generally, this "'right attaches when the defendant is arrested or indicted, whichever comes first.'" *United States v. Seltzer*, 595 F.3d 1170 (10th Cir. 2010) (quoting *Jackson v. Ray*, 390 F.3d 1254, 1261 (10th Cir. 2004), *cert. denied*, 546 U.S. 834 (2005)). In *Seltzer*, the court discussed the unique analysis involved in this constitutional question:

> Establishing the point when a trial has been unconstitutionally delayed is, concededly, a difficult proposition. As the Supreme Court has readily acknowledged, the "right to speedy trial is a more vague concept than other procedural rights. It is, for example, impossible to determine with precision when the right has been denied. We cannot definitively say how long is too long in a system where justice is supposed to be swift but deliberate." *Barker* [*v. Wingo*], 407 U.S. [514] at 522, 92 S.Ct. 2182 [(1972)]. Moreover, although the right is somewhat amorphous, the remedy is severe: dismissal of the indictment. . . .
>
> The Supreme Court in *Barker* established a four-part balancing test to establish if the defendant's right to a speedy trial has been violated. These factors are: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his desire for a speedy trial; and (4) the determination of whether the delay prejudiced the defendant. As the *Barker* Court stated, "[a] balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis." *Id.* at 530, 92 S.Ct. 2182. No single factor is determinative or necessary, rather all four are considered to determine whether a violation has occurred. Id. at 533, 92 S.Ct. 2182.

595 F.3d at 1175-76. Simply put, the speedy-trial right is "necessarily relative," "depends upon circumstances," and cannot "be quantified into a specified number of days or months." *Barker*, 407 U.S. at 522-23 (internal

11

quotation marks and citations omitted).

*(1) Length of Delay*

This is a layered inquiry. "Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Doggett v. United States*, 505 U.S. 647, 651-52 (1992) (quoting *Barker*, 407 U.S. at 530). As the delay here is "more than a year," it meets the threshold of presumptively prejudicial. *United States v. Seltzer*, 595 F.3d at 1176. The court now must "consider, as one factor among several the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett*, 505 U.S. at 652. The factor will weigh more favorably for the defendant with the longer the delay absent some justification in the nature of the charges. *United States v. Larson*, 627 F.3d 1198, 1208 (10th Cir. 2010). More than six years is a lengthy delay that is not explained by the nature of the charges. This factor weighs in favor of a speedy trial right violation.

*(2) Reason for the Delay*

This factor--the government's reasons for the delay--"is especially important: 'the flag all litigants seek to capture is the second factor, the reason for the delay.'" *Seltzer*, 595 F.3d at 1177 (quoting *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986)). It's the government's

burden "to provide an acceptable rationale for the delay." *Seltzer*, 595 F.3d

at 1177 (citation omitted). The Supreme Court recently summarized:

> *Barker* instructs that "different weights should be assigned to different reasons," *id.*, at 531, 92 S.Ct. 2182, and in applying *Barker*, we have asked "whether the government or the criminal defendant is more to blame for th[e] delay." *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). Deliberate delay "to hamper the defense" weighs heavily against the prosecution. *Barker*, 407 U.S., at 531, 92 S.Ct. 2182. "[M]ore neutral reason[s] such as negligence or overcrowded courts" weigh less heavily "but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Ibid*.
> In contrast, delay caused by the defense weighs against the defendant: "[I]f delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine." *Id.*, at 529, 92 S.Ct. 2182. *Cf. United States v. Loud Hawk*, 474 U.S. 302, 316, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986) (noting that a defendant whose trial was delayed by his interlocutory appeal "normally should not be able … to reap the reward of dismissal for failure to receive a speedy trial"). That rule accords with the reality that defendants may have incentives to employ delay as a "defense tactic": delay may "work to the accused's advantage" because "witnesses may become unavailable or their memories may fade" over time. *Barker*, 407 U.S., at 521, 92 S.Ct. 2182.

*Vermont v. Brillon*, 129 S.Ct. 1283, 1290 (U.S. 2009). "'Delays attributable

to the defendant do not weigh against the government.'" *Larson*, 627 F.3d

at 1208 (quoting *United States v. Abdush-Shakur*, 465 F.3d 458, 465 (10th

Cir. 2006), *cert. denied*, 549 U.S. 1238 (2007)). "Where the defendant's

actions 'were the primary cause of the delay,' the second factor 'weighs

heavily against him." *Id.* (quoting *United States v. Toombs*, 574 F.3d 1262,

1274 (10th Cir. 2009)); *see Dickey v. Florida*, 398 U.S. 30, 48 (1970) ("A

defendant may be disentitled to the speedy-trial safeguard in the case of a

delay for which he has, or shares, responsibility. It has been held, for example, that an accused cannot sustain a speedy-trial claim when delay results from his being a fugitive from justice . . . ." (citation omitted));
*United States v. Ingram*, 446 F.3d 1332, 1337 (11th Cir. 2006) ("[A] defendant who intentionally evades the Government's efforts to bring him to trial is culpable in causing the delay.").

The evidence of record is overwhelming that Kevin Frater fled the country on December 12, 2002, to avoid the expected prosecution and consequences resulting from what Frater regarded as the suspicious interruption of the charter flight that he had arranged, suspicious conversations with Austin Williams following the stop, and his distressing loss of five suitcases that were filled with cocaine worth three million dollars. As it did at the time of the detention hearing, the court firmly rejects Frater's incredible and illogical assertion that he left the country in December of 2002 on a planned "vacation" to Spain from which he never returned to the United States where he had lived for a long time.[2] (Dk. 127). The uncontested record and proffered background shows that Frater was a fugitive[3] with

---

[2]At the detention hearing, Frater's counsel proffered that Frater had a New York driver's license for 26 years until he moved to Florida. (Dk. 206-1, p. 50).

[3]The defendant characterizes such a finding to be either "legally erroneous" or "open to question," but neither characterization has any factual or legal traction in the established record. Nor does movant proffer any evidence to support such propositions. While the court will assume for

14

passports from three different countries and that for the next six years he lived at various residences in three different countries, traveled frequently, and held different jobs. Three of those six years he resided in a country that had no extradition treaty with the United States. That the defendant may have traveled and worked under his own name is a circumstance certainly indicating the government may have missed earlier opportunities in Jamaica and England to secure him and bring him to trial. The court is confident, however, the government's negligence in this regard is plainly outweighed by the defendant's intentional efforts to evade prosecution.

The record from the trial of co-defendant Austin Williams confirms that Frater arranged, chartered and paid for the flight stopped in Salina, Kansas. He arranged the flight through the brokerage firm of Global Jet working with Donald Scollins who, for the last four years, had been doing business with Frater and his different companies, Atmosphere Aviation, Air Frater and Charter USA. Unlike other customers, Frater did not use credit cards to secure flights for his companies, and he paid $13,800 cash in advance for Williams to travel on December 10. (Dk. 134, pp. 34-35). On the paperwork he faxed back after signing, Frater listed the lead passenger's name for Atmosphere Aviation as "Anthony Baker," not Austin Williams.

_____

purposes of this motion that Frater did travel and work using his own name, these assumed facts does not undermine the conclusion that Frater was a fugitive who fled the country and did not return until extradited despite knowledge that the government wanted him for drug trafficking.

(Dk. 134, p. 44).

When the plane was stopped in Salina, Kansas, the documentation confirmed that the flight had been chartered by Atmosphere Aviation and that the only passenger, Austin Williams, had documentation showing he worked for this company. (Dk. 89, pp. 202-03). Williams was found to be transporting five suitcases loaded with cocaine worth three million dollars. For the next several hours, Williams cooperated with law enforcement in recording a series of phone calls between him and Frater using the pretense that the flight had been interrupted due to mechanical problems with the plane. The recordings capture Frater making incriminatory comments that indicated Frater wanted Williams to use the assumed name of "Anthony Baker" in keeping the luggage safe in a hotel room until alternative transportation was arranged. Frater impliedly shared with Williams his concern that the luggage would not be intercepted by law enforcement. (Dk. 89, p. 248-249, 259). The phone calls were intended to lure Frater to Salina, Kansas, to pick up Williams and the cocaine. (PSR, ¶ 24). Frater's recorded comments and directions certainly indicate he knew there would be problems if law enforcement seized the luggage.

In the early morning hours of December 11, Frater arranged through Don Scollins of Global Jet for a second plane to pick up Williams and the luggage that morning. (Dk. 134, pp. 76-77). When the plane arrived in

Salina, Agent Smalley pretended to be Williams in a cell phone call to the pilot. He told the pilot that he wasn't going anywhere with the pilot and that he had left the "dope" in a room identified by a particular number at the "Red Coach Inn." (Dk. 206, p. 35). A short time later, a police officer working undercover at this Inn received a phone call from a man with a Jamaican accent. *Id*. The man asked if he could pick up some equipment from that same room number explaining that his associate had left due to some emergency, and the undercover officer said he could. *Id*. at 36. Frater's cell phone records show a call placed to the Red Coach Inn in Salina, Kansas. *Id*. at 37. Officers also learned that a second flight was arranged from Fort Lauderdale, Florida, to Wichita, Kansas, for Frater, Charles Bowe and Damian Coverly. *Id*. at 36. Officers determined that this flight was canceled before it departed. *Id*. This evidence certainly shows Frater's early willingness to incur significant additional expense to recover the luggage quickly, but then quickly changed his plans only to abandon the luggage in Salina and leave the country the very next day.

Sworn testimony from two different witnesses confirms Frater's motive for leaving the country was to flee his expected arrest and prosecution after the drug seizure in Salina. In his Rule 15 material witness' deposition taken in this case, Damian Coverly testified that he and Charles Bowe went to Frater's condo in Fort Lauderdale where Frater explained that

he was suspicious that the drugs in Salina had been seized because he was not receiving the correct responses from Williams. (Dk. 172, pp. 29-30). They discussed whether the plane really had mechanical problems so they could still go back for the drugs. *Id.* at 30-31, 33. Coverly's impression from the conversation was that the decision was Frater's as the drugs were his. *Id.* at 31-32. Frater was concerned over the frequency with which Williams was calling him. *Id.* at 33. It was decided that they would fly back and arrangements were made for the trip. *Id.* at 34. Coverly was told to acquire other cell phones as they were concerned about wiretaps. *Id.* at 34. Less than a minute from the hanger, Frater called off the trip because something was not right in that Williams could be setting up Frater or that the drugs had been seized. *Id.* at 35, 37. At the trial of Charles Bowe, Coverly testified that "Frater then became nervous and decided he needed to leave the country" and that Frater left on one of Bowe's airplanes. *United States v. Bowe*, 192 Fed. Appx. 871, 874, 2006 WL 2271197 at *1 (11th Cir. 2006). As stated and uncontested in the PSR, "[a]fter cancelling the trip, Frater reportedly told Coverly and Bowe that he had to get out of the United States and stated he could never return." (PSR, ¶ 26). In Bowe's trial, Robert Nylund who flew planes for Bowe's family business testified that he flew Frater to Havana, Cuba. 192 Fed. Appx. at 875. Nylund also testified "that Frater told him that Frater needed to leave the country because a

18

friend had been arrested for drugs in Salina, Kansas, that he was scared, and that he could not go back." *Id.* The testimony of these witnesses is consistent with the other evidence concerning Frater's statements and conduct on December 10, his sudden departure from the country on the 12th, his abandonment of the luggage in Salina, and his conduct in immediately leaving and never returning to his existing businesses and residence in Florida.

Frater continues to assert his departure from the country on December 12 was "a pre-planned Christmas vacation." (Dk. 203, p. 2). When it reviewed the magistrate judge's order of detention, this court found:

> The court has heard the defendant's proffer that he left the country in December of 2002 for a planned Christmas vacation in Spain and that he flew to Havana, Cuba, to make a connecting flight to Spain. By calling the trip a "vacation," the defendant implies a return to work in the United States which never happened here. For that matter, the defendant offers no plausible explanation for making a planned vacation trip to Spain via Cuba.

(Dk. 127, p. 15). In the end, Frater's proffer of a vacation trip to explain his sudden departure from the country on December 12 is simply not believable. Instead, the evidence overwhelmingly points to Frater's decision to flee the country leaving behind pending business transactions as well as his established businesses and residence while avoiding arrest and prosecution that he had reason to believe would come from this seizure of a large amount drugs being transported by his employee on a flight he had

chartered. From Williams' responses, Frater suspected the drugs had been seized and he was being set up. Finally, that the defendant appreciated the likelihood of prosecution is supported by his counsel's proffer at the detention hearing that he consulted with an attorney before leaving the country because he knew that Williams had been arrested. (Dk. 206, p. 46).

Most of Frater's arguments are devoted to his proffer that he openly traveled and lived abroad under his own name and that the government failed to take steps to have him arrested in those foreign countries. He asserts that he lived and maintained two residences, one in England and one in Jamaica, from 2003 through the early part of 2006, using his correct name in all of his dealings. He describes his business and employment activities during the same period to include a restaurant business in Jamaica, a car for charter business and an aircraft brokering business in London, and employment with a security company in London. In the early part of 2006, he entered a three-year contract as a flight instructor with Emirate Air in Dubai, a city in United Arab Emirates ("UAE"), and this job required a background check and clearance under "the auspices of the Federal Aviation Administration (FAA) and Transportation Security Administration (TSA)." (Dk. 203, p. 3). According to Frater, he made reports as required every six months to the FAA and TSA. Frater lists his international flights from 2006 through 2008 that he made under his own

name.  Because he lived and traveled abroad openly using his own name, Frater believes the government is to blame for the delay by not contacting him, by not putting his warrant into international law enforcement databases, by not notifying law enforcement officials in England and Jamaica of his arrest warrant, and by not requesting his timely extradition from Jamaica or England.

These circumstances do not bear a strong resemblance to *Doggett* as argued by the defendant.  In *Doggett*, the government for six years "made no serious effort to test their progressively more questionable assumption that Doggett was living abroad, and, had they done so, they could have found him within minutes," living and working openly in the United States under his own name.  505 U.S. at 652-53.  The government here made no such questionable assumptions about Frater's location after he became a fugitive.  United States Marshals had seen Frater in Jamaica working or operating a restaurant.  (Dk. 206-1, p. 8).  Agent Smalley later learned that Frater was working as a flight instructor for Emirate Air in Dubai and confirmed through a DEA attache Frater's employment and address in Dubai, UAE.  *Id.* at 9.  The United States does not have an extradition treaty with the UAE.  When asked if Frater would have been stopped if he had tried to enter the United States, Agent Smalley testified:  "Yes. There was a tax lookout. He had the active warrant for his arrest, and the Interpole-wide

notice had been prepared." *Id.* at 10.  The DEA also received a call from a woman in Ireland who said that Frater had applied for a job with Le Bas International Air Charter to fly private aircraft out of Dubai.  *Id.*  She told the DEA agent that in performing an internet background check she found that Frater was listed as a DEA fugitive.  *Id.*  The woman told the DEA that she had confronted Frater with this information and he told her that "he had been acquitted of those charges and that he was no longer wanted and that--that it all had been taken care of."  *Id.* at 12.  Unlike *Doggett*, Frater was aware of a DEA warrant for him,[4] and he did not return to the United States and there openly live and work under his own name, so the government was not negligent in failing to locate him "within minutes" on its own soil.  505 U.S. at 653.

As far as the government's efforts to secure Frater's return from his foreign travels and residences, the circumstances do not warrant a finding that the government's negligence, if any, is outweighed by the defendant's blame in fleeing the country, his frequent changes in residence and employment, and his extended employment in a country from which he could not be extradited.  The Tenth Circuit has observed that "[a]lthough the government must make some effort to locate a fugitive defendant and bring

---

[4]The defendant Doggett was not faulted for any of the delay as the lower courts had found no evidence that the defendant was aware of the indictment or that the police was looking for him.  505 U.S. at 653-54; *see United States v. Ingram*, 446 F.3d 1332, 1337 (11th Cir. 2006).

him to trial, the effort need only be reasonable, not heroic." *United States v. Anderson*, 185 F.3d 875, 1999 WL 393658, at *3 (10th Cir.) (citing *United States v. Sandoval*, 990 F.2d 481, 485 (9th Cir.), *cert. denied*, 510 U.S. 878 (1993)), *cert. denied*, 528 U.S. 903 (1999).  In *Sandoval,* the court found:

> Accepting the notion that the government has some obligation, even in a case like this, to find a fugitive defendant and bring him to trial, we find that the district court was not clearly erroneous in holding that the government satisfied its obligation in this case. There is no requirement that law enforcement officials "make heroic efforts to apprehend a defendant who is purposefully avoiding apprehension." *Rayborn [v. Scully]*, 858 F.2d [84] at 90 [(2d Cir. 1988)]. U.S. drug interdiction authorities received information (including reports from the DEA office in Guadalajara) that Sandoval was incarcerated in Mexico, and that he had no intention of returning to the United States upon his release. The authorities periodically inquired as to Sandoval's whereabouts with Mexican authorities and received the same information. The district court found that this did not put the government on notice that it should take any further steps to verify his whereabouts or look elsewhere. The 1970 warrant for Sandoval's arrest remained in effect and was the basis for his 1991 arrest.
>
> As important, and unlike the accused in *Doggett*, Sandoval was well aware of the indictment against him. He skipped bail and became a fugitive to avoid prosecution. On the record before us, we find no violation of Sandoval's Sixth Amendment speedy trial right.

990 F.2d at 485 (footnote omitted).  Judged against what the government did in *Sandoval*, the government's actions here meet its obligation of a reasonable effort.

Some courts suggest a greater obligation on the government in locating and apprehending a fugitive as including efforts for extradition if a treaty exists or for finding opportunities to make an arrest. *See, e.g.*, *United States v. Tchibassa*, 452 F.3d 918, 924-25 (D.C. Cir. 2006), *cert. denied*,

549 U.S. 1298 (2007); *United States v. Saric*, 2011 WL 31079 at *7-*8

(S.D.N.Y. 2011). And yet, the court's determination of diligence remains a

"fact-specific" inquiry. *United States v. Ramos*, 420 F. Supp. 2d 241, 246

(S.D.N.Y. 2006) (citations omitted), *aff'd*, 264 Fed. Appx. 57 (2nd Cir.), *cert.*

*denied*, 553 U.S. 1102 (2008). One federal district court in the Tenth Circuit

summarized this line of authority as follows:

> Where a defendant is not attempting to avoid being tried, and does
> nothing to frustrate attempts to bring him to this country to face such
> a trial, delay by the government in initiating extradition procedures is
> properly attributed to the government rather than the defendant.
> Where it is apparent, however, that the defendant does not want a
> speedy trial (or any trial, for that matter) in this country, and resists
> the governments efforts to hold such a trial, the delay caused by that
> resistance is properly attributed to the defendant. Again, it does not
> matter whether that resistance takes the form of deceitful attempts to
> avoid detection, or simply vigorous litigation of extradition
> proceedings; the goal of both forms of resistance is the same, to avoid
> being tried in the United States.

*United States v. Reumayr*, 530 F. Supp. 2d 1200, 1207 (D.N.M. 2007).

In his own briefing, the defendant admits that from early 2003 to

early 2006, he operated three different businesses and was employed in one

other while at the same time maintaining residences in both England and

Jamaica. After three years of floating between jobs and countries, Frater

settled into an extended employment contract with Emirate Air and resided

in a country that has no extradition treaty with the United States. That

Frater may have used his own name during all or most of this period

suggests the government could have been more diligent in locating and

apprehending him during the first three years.  Still, the defendant's

argument that the government should have tracked him down during this

earlier period is "the sort of hindsight that courts are cautioned to avoid."

*United States v. Thomas*, 2011 WL 5102414 at *4 (D. Kan. 2011).[5]  Still, the

defendant's fluid lifestyle during that time period (three different countries

and five different employments) combined with his multiple citizenships and

passports obviously complicated the government's efforts.  Nor do these

circumstances overcome the blame attributable to Frater in fleeing the

country to evade prosecution, in maintaining a lifestyle that complicated

efforts to arrest him, and in moving to and residing in a country without an

extradition treaty.  The due diligence requirement is not violated when no

request for extradition is made from the country of residence which has no

extradition treaty.  *United States v. Diacollos*, 837 F.2d 79, 83-84 (2nd Cir.

1988); *see United States v. Ocampo*, 266 Fed. Appx. 63, 65 (2nd Cir. 2008)

(Unable to extradite, the government acts diligently and in good faith by

ensuring a defendant's arrest upon attempted entry into the United States).

The greater weight of the blame for the delay rests with Frater and his intent

and ongoing effort to evade prosecution in the United States.  There is no

_____

[5]"In determining whether the government is responsible for pretrial
delay due to its failure to effect an earlier arrest of the defendant, 'we must
remember that hindsight is better than contemporaneous or foresight and
Monday morning quarterbacking is a favorite sport of armchair strategists
and litigating lawyers.'  *United States v. Agreda*, 612 F. Supp.  153, 158
(E.D.N.Y. 1985)."  *Thomas*, 2011 WL 5102414 at *3.

evidence that the government delayed to gain any tactical advantage at a trial.  This factor favors the government.

### (3) Defendant's Assertion of Speedy Trial Right

If this assertion is made, then it "is given strong weight in deciding whether there has been a speedy trial violation." *United States v. Seltzer*, 595 F.3d at 1179 (citation omitted).  "[T]he sooner a criminal defendant raises the speedy trial issue, the more weight this factor lends to his claim." *Jackson v. Ray*, 390 F.3d at 1254 (citation omitted).  "The *Doggett* Court held that where a defendant knows of the potential charges against him a lengthy time before he is apprehended, this factor will 'be weighed heavily against him.'" *United States v. Walker*, 92 F.3d 714, 718 (8th Cir. 1996) (quoting *Doggett*, 505 U.S. at 653).  In *Doggett,* the government stipulated the defendant left the country without learning of any potential charges until his later arrest.

As already discussed, Frater fled this country to evade the prosecution that he knew would come from the events in Salina, Kansas.  Additionally, Frater learned while applying for employment as a pilot that the interviewer had discovered from the internet that Frater was a DEA fugitive.  Instead of turning himself in, returning to the United States, and/or asserting a right to a speedy trial, Frater continued his ruse telling the interviewer that he had been acquitted of those charges and that he was no

longer wanted on them.  Moreover, Frater kept living and working in a country that had no extradition treaty with the United States.  Whatever his knowledge about the return of a formal indictment, Frater knew that charges were imminent when he left and it was confirmed for him later that when he learned of his fugitive status on these drug charges.  "[H]is failure to make any effort to secure a timely trial on them (and his apparent desire to avoid one) manifests a total disregard for his speedy trial right."  *United States v. Tchibassa*, 452 F.3d at 926.  This factor clearly cuts against Frater.

### *(4) Prejudice to the Defendant*

"The individual claiming the Sixth Amendment violation has the burden of showing prejudice."  *Seltzer*, 595 F.3d at 1179 (citation and internal quotation marks omitted).  If the victim of extreme delay, a defendant may rely on the presumption of prejudice created by the delay, and no specific evidence of prejudice is necessary.  *Jackson*, 390 F.3d at 1263 (citing *Doggett*, 505 U.S. at 655).  In *Doggett*, which involved a delay of six years attributable to the government, the Supreme Court excused the defendant from making a particularized showing of prejudice.  505 U.S. at 657.

The delay arguably attributable to the government is limited to the period when it learned of Frater's presence in Jamaica and/or England and failed to pursue extradition.  This means that at the very least the initial

delay caused by Frater fleeing the country and the last three years of delay related to Frater's residence in Dubai are not attributable to the government. The government is plainly responsible for less than half of the six years and two months of delay. This is far less than the six-year-delay trigger for presumptive prejudice recognized as the rule from *Doggett*. *Jackson v. Ray*, 390 F.3d at 1264. It is also less than the five-year rule cited in *Toombs*. 574 F.3d at 1262 (citing *United States v. Serna-Villarreal*, 352 F.3d 225, 232 (5th Cir. 2003) ("'Indeed, this Court and others generally have found presumed prejudice only in cases in which the post-indictment delay lasted at least five years.'"), *cert. denied*, 541 U.S. 981 (2004). This case is not an instance of extreme delay under either rule, and Frater is not relieved of his burden to make a particularized showing of prejudice.

The court assesses Frater's showing by looking at the particular interests protected by the speedy trial right: "(1) prevention of oppressive pretrial incarceration; (2) minimization of the accused's anxiety and concern; and (3) minimization of the possibility that a delay will hinder the defense." *Id*. (citing *Barker*, 407 U.S. at 532). "The most important of these interests is the impairment or hindrance of the defense." *United States v. Toombs*, 574 F.3d at 1275 (citing *Barker*, 407 U.S. at 532). "The burden of showing all types of prejudice lies with the individual claiming the violation and the mere 'possibility of prejudice is not sufficient to support [the] position that …

speedy trial rights [are] violated.'" *Jackson v. Ray*, 390 F.3d at 1264 (citing

*United States v. Loud Hawk*, 474 U.S. 302, 315 (1986)). The Tenth Circuit

has recognized that, "[w]hile a showing of prejudice may not be absolutely

necessary in order to find a Sixth Amendment violation, we have great

reluctance to find a speedy trial deprivation where there is no prejudice."

*Perez v. Sullivan*, 793 F.2d 249, 256 (10th Cir.) (citations omitted), *cert.*

*denied*, 479 U.S. 936 (1986). "If witnesses die or disappear during a delay,

the prejudice is obvious. There is also prejudice if defense witnesses are

unable to recall accurately events of the distant past." *Barker*, 407 U.S. at

532. Also observed in *Perez*, "once a defendant has been convicted, the

rights of society increase in proportion to the rights of the defendant."

*United States v. Yehling*, 456 F.3d 1236, 1245 (10th Cir. 2006) (*Perez*, 793

F.2d at 256). "Post-conviction prejudice therefore 'must be substantial and

demonstrable.'" *Id.*

   Of the three interests, Frater's post-conviction pleadings

generally refer to impairment of defense, but they do not make any showing

of prejudice other than conclusory allegations of fading memories. There is

nothing to suggest that Frater's defense was impaired because it no longer

had access to some evidence or to a certain witness due to death. *Toombs*,

574 F.3d at 1275; *see Castro v. Ward*, 138 F.3d 810, 820 (10th Cir. 1998)

(finding no prejudice when "despite [petitioner's] general allegation that the

passage of time made it more difficult for him to present a defense[,] . . .
[h]e has not claimed that any specific witness or evidence was somehow
rendered unavailable or less persuasive because of the passage of time"),
*cert. denied*, 525 U.S. 971 (1998).  Frater comes forward with nothing even
approaching the substantial and demonstrable standard required for
post-conviction prejudice.  This factor favors the government.

*Balancing*

"Speedy trial claims require applying a balancing test." *Jackson
v. Ray*, 390 F.3d at 1266.  Even if the court were to recognize Frater's
argument for presuming prejudice on the fourth factor, this would not
sustain "a speedy trial claim 'absent a strong showing on the other *Barker*
factors.'" *United States v. Arceo*, 535 F.3d 679, 686 (7th Cir. 2008)
(quoting *United States v. Oriedo*, 498 F.3d 593, 600 (7th Cir. 2007)).  The
court regards the balance of factors as tilting heavily against Frater.  Other
than the first factor, the remaining ones weigh in favor of the government
because of Frater's conduct in fleeing the country to avoid prosecution, in
maintaining a fluid and transient lifestyle, in settling down for three years
into a career and residence in a country without an extradition treaty, and in
not asserting any right to a speedy trial throughout his fugitiveness and
particularly after having confirmed in a job application process that he was
wanted by the DEA.  The government was diligent in monitoring Frater's

locations in other countries, and any negligence in not promptly pursuing extradition is outweighed by the defendant's fugitive status and conduct. Finally, the Frater offers nothing real, substantial or demonstrable to prove prejudice from the delay. The court finds no deprivation of Frater's right to a speedy trial or right to due process of law.

The record further shows no basis for believing that Frater could have prevailed on a motion to dismiss for violation of his rights to a speedy trial or due process of law. Because this speedy trial issue as discussed above is without merit, counsel's failure to advance this issue is not constitutionally ineffective assistance of counsel. *See United States v. Cook*, 45 F.3d 388, 392 (10th Cir. 1995). As for Frater's allegations that trial counsel refused to prosecute a motion to dismiss on speedy trial grounds and advised instead that Frater plead guilty, this claim fails both prongs of *Strickland*. There was no merit to a motion to dismiss, and, as discussed later, Frater benefitted significantly under the plea agreement and the Rule 11(c)(1)(C) plea. Counsel's advice to not pursue a motion to dismiss and to accept the plea agreement was not objectively unreasonable. As far as the prejudice prong, Frater "has failed to establish a reasonable probability that, but for his trial counsel's alleged errors, he would not have pled guilty." *United States v. Clingman*, 288 F.3d 1183, 1186-87 (10th Cir. 2002).

**OTHER CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL**

Under this heading, the court groups Frater's following allegations that his counsel was ineffective in: (1) misrepresenting Frater's possible sentence as 384 months; (2) failing to investigate possible defenses and to make contact with another attorney having information helpful to Frater's defense; and (3) in not explaining the meaning and consequences of his plea agreement and advising him that he "could not have a fair trial in Kansas because of his color." (Dk. 186, p. 11). In his reply brief, counsel for Frater emphasizes the trial counsel's alleged failure to investigate a letter from Mr. Bowe's counsel concerning "information that was potentially useful to Mr. Frater's defense." (Dk. 203, p. 13).

A court presumes a counsel's competence, "and the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (citation omitted). In this respect, the Tenth Circuit has held, however, that "[a] miscalculation or erroneous sentence estimation by defense counsel is not a constitutionally deficient performance rising to the level of ineffective assistance of counsel." *United States v. Gordon*, 4 F.3d 1567, 1570 (10th Cir. 1993), *cert. denied*, 510 U.S. 1184 (1994). A court is to evaluate a counsel's performance from the counsel's perspective at the time while keeping "'in mind that counsel's function, as elaborated in

prevailing professional norms, is to make the adversarial testing process work in the particular case.'" *Kimmelman*, 477 U.S. at 384 (quoting *Strickland*, 466 U.S. at 690). Looking at *Strickland*, the Supreme Court in *Kimmelman* explained a counsel's duty to investigate within the overriding goal of a counsel fulfilling the adversarial testing process:

> Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, we noted that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691. But, we observed, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Ibid*.

477 U.S. at 384.

The defendant looks to the guideline sentencing range of 168 to 210 months calculated in the PSR to argue his counsel misrepresented the defendant's possible sentence. The defendant overlooks that without the reduction for acceptance of responsibility, a benefit from entering a plea, his guideline sentencing range jumps to 235 to 293 months. Additionally, with a four-level enhancement for being an organizer of a criminal activity involving five or more participants,[6] his sentencing range jumps to 360 months to life. Of course, Frater's counsel also was aware that Bowe, an alleged co-conspirator of Frater, had been convicted of drug trafficking charges related

---

[6]There was a reasonable basis for believing the court could apply this enhancement based on the facts supplied by Coverly's trial deposition and the record from the trial of Austin Williams.

to this same conspiracy and received a sentence of 384 months' imprisonment. (Dk. 127, p.13, n.1). There is nothing unreasonable in the defense counsel's estimate of a possible sentence following trial and conviction.

Frater's conclusory allegation that counsel did not investigate possible defenses or contact another attorney does not meet his burden on the prejudice prong. Frater must demonstrate that "there is a reasonable probability that, but for counsel's [failure to investigate], the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Absent a specific, affirmative showing of exculpatory evidence, the prejudice prong is not met. *Patel v. United States*, 19 F.3d 1231, 1237 (7th Cir. 1994); *See United States v. Manriquez-Rodriguez*, 182 F.3d 934, 1999 WL 345505, *5 (10th Cir. 1999) ("To satisfy the prejudice prong of the *Strickland* test for ineffective assistance of counsel, a defendant must specifically show what beneficial evidence an 'adequate' investigation would have produced. Simply speculating that investigation might have resulted in something useful will not suffice."). Speculation does not suffice for a reasonable probability of a different outcome. *United States v. Boone*, 62 F.3d 323, 327 (10th Cir.), *cert. denied*, 516 U.S. 1014 (1995). In particular, the defendant must show that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *United States v. Harms*, 371 F.3d at 1211.

34

Frater fails to identify with particularity what defenses or information that his counsel failed to investigate or discover. Frater does not disclose the contents of Bowe's attorney's letter and does not proffer any reasonable likelihood that the letter or a call to Bowe's attorney would have yielded information which would have caused Frater to insist on going to trial. While Frater's counsel in the reply brief asks for a hearing to develop this allegation, the court declines this hearing request because sheer speculation is not enough. Having no meaningful factual basis for determining prejudice, the court finds the defendant has not met his burden on this allegation of ineffectiveness.

Finally, Frater challenges his plea as involuntary in that his counsel failed to file a motion to dismiss on speedy trial grounds and then pressured him to enter the plea based on several representations including that "Frater could not get a fair trial in Kansas" because of his race. (Dk. 186, p. 4). Assuming this conversation occurred, Frater also knew that a Kansas jury had acquitted Frater's employee, Austin Williams, on these same drug charges though Williams was of the same race as Frater. Frater also argues that his counsel failed to explain the terms and consequences of his plea agreement. At the change of plea hearing, Frater told the court under oath that he had "discussed this case throughly" with his attorney and that he was "satisfied with the services" of his attorney. (Dk. 177, p. 4). In

entering his plea, Frater told the court that no one "forced" him to enter the plea and that he was doing so by his "own free will and because . . . [he was] guilty of it." *Id.* at p. 13. The court accepted Frater's plea upon finding that:

> the defendant is fully competent and capable of entering an informed plea, and that your plea of guilty is made freely, voluntarily, knowingly and understandingly, and the plea is supported by an independent basis in fact containing each of the essential elements of the offense, and you understand the charges and the penalty.

*Id.* at p. 25.

The defendant took an oath at the beginning of the hearing, and his direct answers and declarations in court "carry a strong presumption of verity" which he has not rebutted. *Lasiter v. Thomas*, 89 F.3d 699, 702 (10th Cir.), *cert. denied*, 519 U.S. 998 (1996). The terms of the plea agreement plainly addressed all material terms, and the plea colloquy adequately covered those terms. The defendant has not articulated nor demonstrated from the record what he did not understand about his plea agreement, his sentence, or his right to trial that allegedly rendered his plea involuntary and unknowing. The burden rests squarely with the defendant to show it was not knowing and voluntary. *United States v. Smith*, 500 F.3d 1206, 1210 (10th Cir. 2007). The transcript of the change of plea hearing shows the defendant plainly understood the proceedings and was satisfied with the representation of his counsel. There is nothing in the factual

circumstances surrounding this Rule 11(c)(1)(C) plea proceeding to suggest that Frater would have proceeded to trial had his counsel not made these representations. *Miller v. Champion*, 262 F.3d 1066, 1072 (10th Cir. 2001), *cert. denied*, 534 U.S. 1140 (2002). Frater has not carried his burden on these § 2255 allegations.

As now required by Rule 11 of the Rules Governing Section 2255 Proceedings, "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Such a certificate "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires the applicant to demonstrate that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotations omitted). The above rulings are not of a kind or quality that a reasonable jurist could debate whether Frater's arguments should have been resolved differently or whether the issues are worthy of more consideration. The court will not issue a certificate of appealability for this order.

IT IS THEREFORE ORDERED that Frater's motion for relief under 28 U.S.C. § 2255 (Dks. 185, 186 and 203) are denied;

IT IS FURTHER ORDERED that a certificate of appealability is denied.

Dated this 9th day of February, 2012, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge